And just divide up your time as you choose between the two cases, 30 minutes per side, and you figure out how to argue them. Thank you very much, Your Honor. Your Honors, may it please the Court, Richard Seibert from Port of Henry's for the appellant. Which appellant? Appellee and cross something, A'Lor International. You're for A'Lor? I'm for A'Lor, Your Honors. In a nutshell, Your Honors, the District Court correctly denied the first preliminary injunction because Charriol did not meet its burden of showing an effect on U.S. commerce as required for the Lanham Act to have extraterritorial reach. Why wouldn't there always be an effect? I mean, I've never bought jewelry like this, but I'm kind of a camera buff. And if you look at the ads for cameras, they typically have North American distributor or American distributor, and then they have gray market cameras where you won't get warranty service from the American distributor, but the price will be somewhat lower. And they're called gray market because it's not illegal or anything. People bring them back. Why wouldn't, if the price is any lower in Israel, say, because of the exchange rates or because of the pricing and the market there, why wouldn't someone just bring them back and sell them here if they're sold cheaper there? This is a different case than that, Your Honor. There is nothing on the record, and there was no issue of any gray market imports into the United States from either Kazakhstan or Israel, which is where the record shows the accused items were sold. And the agreement between the parties, the so-called Jewelry Agreement of 2010, explicitly defines the territory as the United States, Canada, and there's a separate agreement that speaks to the Caribbean. There's nothing to foreclose my client, Al-Or, from selling its own designs, which all of these designs are, anywhere else in the world. So I understand the court's question, and the issue of intellectual property protection for gray market goods is a fascinating one, but this simply isn't that case. There was no evidence on the record of any impact on U.S. commerce. The only showing that Shariol made was that Al-Or was a U.S. company based in San Diego. And the case law that we cited establishes that where there's no other impact to U.S. commerce, then you have to show monetary damage to a U.S. plaintiff. And we don't have that in this case. The party that was claiming damage, Shariol, it's a little shadowy. They're purportedly... I thought it was clear. I thought they're an Isle of Man company that's headquartered in Switzerland. Well, then they filed a statement saying more than 10% is owned by a Panamanian corporation. And the principal is a French citizen who lives in Hong Kong. And they directed that the royalty payments go to a post office box in the Republic of Ireland. So it's, I guess it's a global village, but they've covered a lot of it. Are we talking about the first case now? Yes, Your Honor. Okay. The judge found there that he had questions about the application of the Lanham Act to this situation where you have a foreign plaintiff and whether it would apply. And he determined that the record wasn't sufficient for him to reach that decision yet. What more would he need to reach that decision? He would, I believe, under the case law, have to find that there was cognizable damage in terms of financial damage to a U.S. plaintiff that the accused... Well, he already knew we don't have a U.S. plaintiff. So whether there's damage or not seems to be irrelevant. ...could have found that, as Judge Klinefeld suggested, that gray market goods were finding their way into the United States. And, in fact, the case law that is applicable, I may have the name wrong, with Ocean Garden, there's a series of cases, and in each one of those cases, the impact of the foreign activity on U.S. commerce was that the goods came back into the United States. I think it still shows that when it comes to a permanent injunction, if it does, if we affirm all that happens is there's no preliminary injunction, but the case isn't over. Is that right? Your Honor, I'm sorry. I have a little bit of a hearing problem. I couldn't hear how you started that question. I'm sorry. What we have before us on this first case now is just a denial of a preliminary injunction. Is that right? Yes, Your Honor. And on the second case, the partial grant of one. Leaving the second case aside, if this case were to go back, and Shario was able to prove that there was a substantial gray market, then I suppose it could come out the opposite way on a permanent injunction. Is that right? Yes. Okay. I understand now. Or even a reapplication for a preliminary. It came out there in discovery. It's possible, Your Honor. Yes, indeed. Judge Gould, if I could get a quick clarification. I just want to make sure I've got the parties and cases right in mind. In the 2013 appeal, where the claim for injunction was based just on trade secret or Lanham Act, Allure won and you're the appellee, right? That is correct, Your Honor. Then in the 2014 case, when the injunction was based on both trade secret and contract, then Shario won. So you're the appellant in that one. I would mostly agree with one wrinkle that on the second case, Shario won on the contract claims. According to the district judge, they lost on the trademark claims, and the reason that we're here from my client's perspective is that the preliminary injunction that was issued is internally contradictory and mixes those two things up. Right. Okay. I understand your position was the court couldn't really find the track without making some judgment on the validity of the trademarks. That is one of the two points. Your Honor is correct. The actual injunctive language is premised expressly on valid trademarks, and in its order, the district court expressly declined to make any finding one way or the other on that, and it's very much an issue. The other ground for our appeal of the second preliminary injunction is that the district judge, we believe, made a clear error of law in finding in his ruling that a contract provision that was limited to the term of the agreement somehow had application even beyond it, and one of the problems with the preliminary injunction is that the actual injunctive language at the end of the district court's order disconnects with the discussion prior to it. So clear error of law on the contract interpretation and logical impossibility on the contract application based on valid trademarks. Okay, I think I've got my framework in mind. I'll sit silent and let you craft your argument as you think best. Be sure to give yourself enough time on the other case, because at least for me, it's harder, more complicated. Thank you, Your Honor. With the panel's permission, I would, in fact, like to move directly to that. It's our position that the district court incorrectly granted the second preliminary injunction, and there was a clear error of law because it enjoined trademark infringement, but it made no such finding on such claims. To the extent it granted preliminary injunction on the breach of contract claims, those claims are inextricably intertwined with the trademark infringement claims based on the language of the contract and based on the language of the preliminary injunction itself. It's only preliminary, so all he has to do is decide probability of success. He doesn't really have to make a definitive decision about whether the mark applies. Isn't that right? Yes and no, Your Honor. The court has to decide more than simply a probability of success. It has to find irreparable harm, and we have a strong argument, I believe. That's not an issue of whether they have a good trademark to this cable jewelry. No, Your Honor, it's a different issue. That's what I meant. In fact, you say in your yellow brief, you say the cable design mark is all that is issue on this appeal, right? Let's correct, Your Honor. Okay, so if we were to decide that you're stopped from challenging the validity of that mark, either by contract or by operation of law, does that end your appeal from that? It may well, Your Honor, but we believe there is no estoppel, either judicial estoppel, estoppel in Pais, any kind of estoppel for the reasons set forth in our briefing, and I can go over that if it pleases the court. I'm having trouble seeing why there wouldn't be an estoppel, both under the doctrinal rule that if you've operated under a trademark, you can't challenge it, and also under the contract, which says that even after it's terminated, I'm looking for the exact words, but basically it says just what you'd expect it to say, even after the contract period is all over, you still can't act in a way that conflicts with your recognition of the mark. Well, with respect, Your Honor, that last begs the question of whether there is a valid mark, but the district court- I don't know about that. It begs the question of whether the trademark is the cable design or whether the trademark is just the words, but I don't know if it begs the question of whether there's a valid trademark. I understand, Your Honor. I would respectfully point out that the word marks are not at issue on this appeal. Judge Gettleman is correct that what we have before us is the cable mark, and to respond to the issue of estoppel, the district court correctly recognized that the estoppel doctrines raised by Shario may not be successful. In a nutshell, they fail because, number one, licensee estoppel does not bar a former licensee from challenging the validity of a mark after termination of the license agreement. Now, there's a dispute here, obviously, whether the license agreement was validly terminated or not, but that's an issue that the district court correctly said is preserved for trial, made no finding on it. Number two, a no-challenge clause in a license agreement does not bar a licensee from challenging the enforceability of a mark after termination of the license agreement. Number three, PCI Shario cannot establish so-called estoppel in Pais because Alor never represented that it would not challenge the validity of the cable mark after termination of the agreement. Part of, if not all of, the conduct that was at issue in the injunction that was issued by the court in the second case was during the sell-off period. Isn't that correct? That is correct, Your Honor. And isn't that sell-off period part of the contractual relationship between these parties? It's part of the contractual relationship, but it is a completely false legal argument, and no authority has been presented for the proposition that a contracted for limitation following termination of an agreement somehow extends the agreement itself. I'm sure that the panel has seen a lot of trademark licenses and its standard operating procedure. When a trademark licensor stops the license, the licensee has X amount of time to sell off what they've got. It can be 30 days. It can be six months. That does not extend the other terms and provisions of the license. That is a bargain for limitation that was entered in. Was all of the sell-off within a period that was so provided? Yes, it was, Your Honor. Yes, it was. What stimulated my question about the agreement was Section 13.4, where it says after the contract is terminated, licensee shall not use other than is authorized in the territory any of the trademarks, and this restriction shall operate as long as the licensor act continues to have exclusive rights in the trademarks. Are you saying that that clause doesn't apply, or that it is limited to the sales territory? That clause does apply, Your Honor, but it applies to valid trademarks, trademarks that SHARA owns and controls, and that is a very insightful question because you've gotten to the absolute crux of the matter. Judge Anello, in his order on preliminary injunction, the second one that we're challenging at page 8 of his order, wrote, I quote, The post-license period, estoppel, not based on the agreement, I thought the critical statement of what the law was on that was this Fifth Circuit case, professional golfers, and it says after expiration of the license, a former trademark licensee may challenge the licensor's title on facts which arose after the contract had expired, which suggests that the estoppel lasts forever, and it dies only if some new facts would prevent the estoppel, and there aren't any new facts. I think we're having a sound problem. We can't hear Judge Gould. Now you're back. Yes, sorry. Now you're off. Now can you hear me? Now you're back. Okay, sorry about that. I think we're okay. Shall I proceed, Your Honors? Let's hear what Judge Gould is about to ask. Okay, one second. I only have one general concern, and that was that I thought the contract said that a lure, after a contract termination, sell anything that closely resembled the trail of trademarks. If I'm right on that, would that prohibition as a matter of contract require that they be valid trademarks, or would they be, as a former distributor, precluded from selling something that closely resembled Cheryl's product because of whether it had a valid trademark? The clause in question, Judge Gould, I think it's 3.21, 3.21 operates during the term of the agreement. During the term of the agreement, within the territory, basically North America, a lure promises not to sell designs that are similar to the ones it's selling in the territory using the Cheryl trademark. That's a critical distinction. That's the basis of the whole agreement between the parties, because keep in mind, all of these designs, all of them, are out lures intellectual property to start with. They've copyrighted them. They've registered the copyrights. This is not so much a license agreement as it is almost a de facto joint venture, where one party contributes to the designs, the other one contributes the brand name Cheryl. That's 3.21, and that's not dependent on trademarks. 13.4, I'm probably getting the numbers mixed up, but no, it is 13.4. 13.4 says that forever, not just during the term of the agreement, but afterwards as well, a lure promises not to infringe Cheryl's trademarks that it owns and controls. Of course, that presumes a valid trademark, because if it's an invalid trademark, it's not a trademark at all. Those are two different provisions. The district court, in granting in part the second preliminary injunction, and based its reasoning on the first provision, and said that that first provision applies even after the agreement is terminated. That's plainly wrong, a clear error of law on the face of the contract. That's not what it says. I have confusion that keeps creeping into my mind, and I need your help in allaying it. I labor under what may be the misconception that you copyright designs and you trademark brands. If it says Paul Revere Silver, it better be made by the Paul Revere Silver Company. If it looks just like a Paul Revere Silver pitcher, but you market John Smith Silver, that is not a violation of the Paul Revere trademark, but if Paul Revere copyrighted the design of the pitcher, it may, depending on whether the copyright is valid, be a violation of Paul Revere's copyright. What am I mixing up? You're not mixing up anything. You're asking a very, very good question that implicates the whole area of so-called design trademarks. I got this cable issue in here, and I keep getting confused about why we're talking about the cable design as trademark when it seems like it would be copyrighted. Let's talk about a different example, the Jeep, the grill on the front of the Jeep. That has actually been registered as a trademark. You can go to the trademark office. It's the face of the Jeep, just like a BMW grill or a Rolls-Royce grill. The theory is that some design elements have become so distinctive over time, through heavy advertising, through sales, they've become invested with secondary meaning, that they've become such a strong designator of source that they themselves can serve as a trademark. I get it, and that's where the overlap comes from, whether it's distinctive enough to be a trademark. That's right, but there's always a but. It's a source of fertile litigation because design marks inherently are much less strong. They're weaker than word marks. The U.S. Supreme Court itself has cast considerable doubt on the inherent ability of a design mark to even have secondary meaning. That's the Walmart versus Samara decision. There are quite a few legal commentators who think that the whole notion of a design trademark is nonsense. Another problem with them is that it's a standard rule, a bedrock rule of all intellectual property that you can't protect function. You can only protect ornamentation, decoration, reduction to an idea, and by definition, design goes to function. Now, coming back to this case, in this case, it's our position, and I know that opposing counsel disagrees, that the design mark in question, which is just this little strip of cable jewelry. Sure, you're saying everybody and his brother uses the cable design because it's a pretty design, and they're saying, no, it's a distinct Philippe Chariot design. Well, they're not saying that because they recognize themselves that originally it came from a company called Fred, Fred Joye. Which they bought. That they bought, but it's more than that because the record shows, and we've cited the excerpts of record, that one district court and one appellate court basically found laughable the notion that cable jewelry as an element could be a trademark, and at that point, the excerpts of record show Chariot instructed my client to take no more action. I read that letter, and it looked to me like it wasn't that clear. I thought maybe they were saying it's just not worth suing these little operators that don't threaten market share because they don't have the money to pay judgments and litigation costs exceed the value of the lawsuit. Your Honor, I think the record shows, and certainly the trial will show, it's a lot more than that. They did not want to risk, they didn't want to spend the money on attorney's fees. They didn't want to risk a concrete ruling against them. The directive was clear. Don't enforce this. We're not policing it. It's going to be abandoned, and the proof is in the pudding. The fact is that as we sit here or stand here today, everybody and his brother uses cable in jewelry. In fact, if you asked my wife or anybody else who knows about jewelry, the only company that's really associated with cable jewelry is David German. Other than that, it's like having wheels on a car. Everybody has it. In any event, we cited the applicable law, Judge Gettleman, in our brief, and if I could direct you to only one brief, I think our third brief, Allure's third brief on cross-appeal, is the best of the lot. It simplifies the issues appropriately. It distills- Which color is that? I don't know. I only look at the copies, and the copies are all black and white. Is it the yellow one? If it says third brief, that's it. Third brief on cross-appeal. Yes, that's the one I'm looking at. That's our best one, and that's got the law. That's the only one I'll read. Suffice it to say that we've cited chapter and verse on why there is no estoppel here. Very simply, I want to sum up and save a couple of minutes. Very simply, the district court's finding in the second preliminary injunction that the contractual prohibition on selling similar designs, and keep in mind these are Allure designs, extended beyond the term of the contract. That's a clear error of law on the face of the contract. The district court expressly did not reach the trademark claims, yet if you look at the preliminary injunction language, it is expressly based on trademarks, but with no finding of the validity of those trademarks. There's a disconnect between the court's reasoning and the actual injunctive order, and the reason we're here today, it has hurt my client. Shariall went to town with this preliminary injunction, engaged in what we think is a fraudulent marketing campaign, and my client has lost a lot of business, and at the end of the day we think there's going to be quite a claim against the bond. But for the time being, it's our position that the preliminary injunction was properly denied in the first case, shouldn't have even been brought again because it was a second bite of the apple in the second case, which was an end run against the deadline on amendments to the pleading, and to the extent it was granted, it was a clear error of law on the face of the contract, and internally inconsistent because it was premised on the validity of the trademarks, but that validity was expressly not addressed by the court. So PCI has posted a bond? Yes, Your Honor. How much was the bond? $1.3 million. Thank you. And with the panel's permission, unless there are more questions, I'd like to reserve my time. Thank you, counsel. Thank you very much. May it please the court, Craig Flanders from the law firm of Warsh and Goering, for Philippe Shariall International Limited, who we have referred to in the briefs as PCI. There are a number of issues that I think need to be cleared up before we're working off of a paradigm that may not be what the actual facts of the case are. I have something on my mind here, and I wonder if – I'll concentrate better on your issues if I get it off my mind, so help me on it. I look at Schedule A, the contract that registered marks here, and it's kind of like a spreadsheet. It says country, and then it says trademark, and then it says serial number, registration number, and then it says goods classes. When I look under trademark, they're all words, Celtic, Shariall, and Columbus with a Roman-style U. They're not pictures. It looks like the trademark is the word, kind of like Paul Revere on a silver pitcher. I don't quite get – there was also some language in the contract that sounded like that to me. The contract had this language – let me find it for you. So you'll be able to address what's on my mind here. The contract, Schedule A, looks like the only trademarks that can't be infringed are these words, and then I look at the words, and it says in Section 2.5, and it says the trademark shall be depicted entirely in capital letters or otherwise distinguished from accompanying text to indicate that the term is a trademark. Now, capital letters and text and term only speak to words. They don't speak to a cable design. So I'm not clear on why a cable design is a mark at all. Well, we can clear that up very easily. With contract interpretation, it's always best to start with the specific over the general. And so you can look at Article 1.1, which defines trademarks for purposes of the contract. And what it says is that Schedule A is among the trademarks. So that's the first part. And then the second part says, and all other trademarks, whether registered or by common law or usage, which may or may not be registered, but to which marks are owned or controlled by licensor, which is PCI. You've got a catch-all clause there, but it's sort of hard to understand why, if they wanted the cable design to be a mark, they wouldn't have said so specifically instead of hoping that the catch-all clause would reach it. Well, that gets to the intent of the parties. I think that you can – and Judge Anello did this. Judge Anello looked at the plain language. It's not like the parties didn't know that the cable mark was a registered mark. I mean, this generic misargument that we're hearing is a very recent argument of convenience that happened a few weeks before a market takeover launch happened last year. For decades, Allure has endorsed the cable mark, has joined contracts for the assignment of the – So at the time – Making money from – because of their partnership with Philippe Chariot, why would they challenge it? It's when they want to sell their own design under their own name that they have an incentive to, and we'll get to the estoppel issue in a few minutes. Sure. The fact that they didn't challenge it while they were making money from it doesn't show that it's a good trademark. Well, it's not just that they didn't challenge it. They endorsed it. They enforced the cable mark against third parties. I mean, the Allure principal and chief designer, for example, in 2000 took a case up to the Second Circuit in which Allure was a party in which he put in affidavits which were relied upon by the Second Circuit making statements about how this mark is strong and this mark is – I read that in the district judge's remarks, and I thought, well, wait a minute. You don't get a judicial estoppel just because you said something to a court. You have to gain something from having said it to the court. Parties are allowed to take inconsistent positions in different cases or in the same case, and as long as they don't gain something from a representation they've made, there's no judicial estoppel. There may be some other sort, but there's no judicial estoppel. Did they gain something from saying that to the Second Circuit? I agree with your statement of the law, and in our view, they did. The Second Circuit reversed on the issue of functionality after reviewing the record, which included Jack Zemmer's affidavit endorsing the cable mark and saying that it immediately identified the source of goods. There was some discussion you had inquired about trademarks versus copyrights, and I believe that there is a deliberate effort here to confuse the two concepts as well as the concept of trade dress, and we devote a portion of our brief to this. Copyright is not a defense to trademark infringement. Copyright has nothing to do with trademark infringement. It is not an affirmative right at all. They mention copyright and trade dress over and over, and they call it their designs and their designs, but that does not justify their use of the mark. Stephen King writes a novel. It is nevertheless the right answer to a trademark claim by Stephen King that your only claim to ownership of anything relating to this novel is copyright. Well, copyright has to do with the expression of an idea in a medium,  so they serve different functions. That actually was the reason for my inquiry. We don't have a decision yet from the district court on whether the cable design identifies a source, and so I read the contract, and it looks like what the contract is talking about as a trademark is just the words. Well, not only do we have the plain language of 1.1, which includes in the definition all registered marks, which at the time Allure clearly knew that cable was not just a registered mark. It had reached incontestable status. So it was a registered mark that had been endorsed by Allure at the date of the contract. Now about the catch-all clause on 1.1, all other trademarks, whether registered or by common law. Yes. Okay. Okay, so that clearly includes. I mean, it may be inartfully drafted. It may raise the question, well, why do they have a schedule that includes some of the trademarks and not others? I can't answer that. I don't know. I think there was an effort with the way that they were referring to the schedule, that they wanted to talk about certain products with respect to word marks, but that didn't mean that if they didn't want to include cable marks, and by the way, there's other trademarks, too, that they wanted to include. They could have put in the contract this cable jewelry, and we've got pictures of it attached as Schedule B. Absolutely. Even though you created the design and you manufacture it under our name, it's ours forever, and you can't sell similar jewelry under your own name. They could have had that. Yes. I mean, they did put a new challenge clause in here, and in our view, read in combination with the definition of trademarks in 1.1, that was the intent of the parties, because, of course, there had been a lot of litigation where the parties joined together against third parties with respect to this mark, and that was one of the reasons why they had the new challenge clause. Actually, this agreement was one of several agreements that arose out of a settlement, which is important because a new challenge clause is part of a settlement under the Flexbook case out of the D.C. Circuit. Hold on. I want to be reading while you talk. Which clause? What number? The new challenge clause is Article 9.5. Thanks. And it's fairly unambiguous. I've got it. And so you could also raise a similar question, why would PCI want to retain this new challenge clause in this agreement? Because the Sherry Allmark, the strength of the Sherry Allmark is not in question. It's also an incontestable mark. It was never in question at the time of this contract. Why would they want to retain this new challenge provision? The reason is because there had been a dispute about this cable mark. There had been more than one. Does that apply after termination? It does, because there's a survivorship clause, which Allure's counsel conveniently ignores in saying that the restrictions stop at termination. There's an omnibus survivorship clause in this contract which carries on these restrictions past termination, and that's in 13.5. So, yes, it is our view that the new challenge clause, because the new challenge clause is tantamount essentially to a waiver. I mean, it's a waiver of the right to challenge this very mark that they are challenging right now, and it was part of a settlement. I mean, that was procured as a bargain for exchange. And under those circumstances with virtually identical language, we cite to a number of cases where there's strong public policy. I cited to Flexfoot was sort of the main case, Flexfoot and its progeny. I'm looking at 13.5. I was a little behind you here. I'm sorry. And what it says is, upon the termination of this agreement, licensor, that would be Philippe Charial, shall not engage or direct any third party to manufacture or sell any products using licensees, and I think that would be Allure's copyrighted designs, without the prior written consent of licensee. That would be Allure. Licensor, Philippe Charial, agrees that a violation of this section would be a material breach. I don't understand how that. That's because I cited you the wrong provision. I'm sorry for wasting your time. I meant to say 13.1. My apologies, Your Honor. Thanks. The rights of either party shall not be prejudiced or ceased on account of the cessation of this agreement, but shall survive and be enforceable, including but not limited to the sell-off period. Is that what you mean? Yes, Your Honor. So there's been a lot of discussion. Can I interrupt you? I'm sorry. I think we're losing track. This is a great intellectual discussion about intellectual property, and it's very enjoyable, and you guys are really good, but we're talking about the denial of a preliminary injunction and all that goes into that. We all know what the elements of a judge's decision is in granting or denying a preliminary injunction, and this judge said that, without getting into a lot of the things we've been talking about, he said he didn't have a record sufficient to make a decision about the extraterritorial application or whether the marks were strong enough. He hadn't gotten a consumer survey, which is very common in these types of cases, to show the likelihood of confusion. He just wasn't ready to grant a preliminary injunction because he didn't think the record was sufficient. Isn't that a discretionary call and that we should review with a great deal of hesitance in putting ourselves in the district judge's position on that? Your Honor, I believe you're referring to the first appeal, the appeal of the denial. I am. And there are obviously two separate records before the court, and the factual scenario, I recognize that we're looking at the position that Judge Anello was in in September of 2013 when he was facing what I refer to as the soft launch, which was just the baby steps that were being taken to test the waters in Australia and Kazakhstan, and by the way, on websites in Facebook in the United States, that's what Judge Anello was looking at at the time. That factual scenario, as a practical matter, is moot. Are you dropping the first appeal then? We are not, and it is. At the risk of sounding too much like a lawyer, we're not, and here's why. Because the independent basis of an injunction on the Lanham Act versus contract still matters. It still has ramifications. It has ramifications for extraterritoriality. You heard a lawyer's counsel talk about how there was a territorial restriction to the contract. They've taken the view there's a territorial restriction to the injunction, in fact, that was expressed today, even though there's no geographical scope stated in the injunction that was granted. Let me stop you right there. He granted the injunction for you based on the contract, and yet the contract has a territorial limit, but the injunction doesn't. Isn't the injunction too broad? Shouldn't it be limited to the territory if it's based on the contract? The contract is not limited to a territory. There are certain provisions that are limited to territory, but it's not limited to territory. In fact, there are several provisions in here that talk about a law distributing through Khalif Sherial International a broad jury that PCI would actually be responsible for registering copyrights on those designs. So it did encompass more than just a territorial restriction. While there is territory defined for purposes of what the primary purpose of the contract was, distribution within a defined territory, it's not our view that there is a territorial restriction. But you raise an important point, which is that we believe that an independent basis exists for granting an injunction under the Lanham Act, and that's why we're not dropping the first appeal. While the factual issues have changed, and what Judge Anello was saying, I don't have a complete record, and so the instinct might be, well, why don't we just remand and let them go through discovery? Discovery has substantially happened already. But on the second injunction, we provided that evidence. Wait a minute. If you're saying that the first appeal is moot, but that we should decide it because it still matters, it strikes me that the fact that it still matters is a good reason not to decide it, along with mootness. You don't want to make a decision that matters in a moot case. There's no case or controversy, and you may get it wrong. In what sense do you mean that the first appeal is moot? What I mean is that the facts have been superseded. Okay? I don't mean that all of the legal issues are moot, because the extraterritorial – We don't decide legal issues. We decide cases. Is the case moot, or is there still a case or controversy on the injunction that you sought and didn't get in the first case? There's still a case or controversy, and it was raised anew. You could view it as renewed even on cross-appeal, because on cross-appeal, on the second appeal, you did not get an injunction in the first case against the extraterritorial sales. Correct. And then in the second case, you did get an injunction. Based on contract. Based on the contract, I suppose. So why would we still decide the first case, now that you've got your injunction, which is broader than the one you sought in the first case? One of the issues has to do with extraterritoriality. Why would we decide it, if you've got an injunction where the judge says, I don't care if it's extraterritorial, intraterritorial, societal territorial, whatever kind of territorial it is, it's enjoined? Well, the view taken by a law is that the silence in the injunction doesn't mean that it's unlimited in geographic scope, but that it's limited to the geographic scope of the contract. So I think it's unclear if you're to believe Allure's theory. But the Lanham Act claims are also important for a different reason, and perhaps a lesser reason. What do you think that the injunction in the second case prohibits Allure from doing? Exactly what it says in the injunction, that it's not restricted by geography. It turns out they can't sell cable jewelry that looks like the chariol jewelry anywhere under the second injunction. Is that right? Yes, Your Honor. So why would we decide anything about the first injunction that says you can't sell it in Kazakhstan and Israel, if we've got a second injunction that says you can't sell it anywhere? Well, we've talked about extraterritorialism. And the judge said, well, I don't know. I don't have enough facts. But then the second time he says, I do have enough facts. You can't sell it anywhere. Correct, Your Honor. And we've talked about extraterritoriality under subject matter jurisdiction of the Lanham Act, but we didn't limit what we were seeking in the first injunction just to outside territory sales, and it could be viewed as a renewal or a cross-appeal because we're asking for the injunction to be granted on the independent grounds of the Lanham Act aside from contract. One of the reasons we're doing that, you may ask, well, you've got your injunction. Why would you do that? And the reason is because if at trial Allure prevails in proving to a jury that, hey, we somehow didn't breach the contract, they're going to seek, and they've already said in the opening statement, damages against the $1.3 million bond. Well, if we had a right to an injunction under both grounds, and Judge Anello was wrong in how he interpreted the estoppel doctrine, which cut off his entire inquiry of whether or not injunction is allowed under the Lanham Act in the issues on the second appeal, then we're entitled to have an injunction of both the Lanham Act and breach of contract to immunize against that potential series of damages. It also has ramifications potentially for attorney's fees because there's an attorney fee shifting in the contract. So did we prevail? And I said, you know, perhaps that's a lesser issue that's not as important, but there's a question. Did we prevail? Should we have prevailed in the original injunction? It depends on how the profits are tabled to where we compare to the price of attorneys. Right. Perhaps. But let me get to some of the other issues that were raised. Counsel, I have one question. One second. If we have pulled the injunction based on contract in the second case, does the earlier appeal become moot? Your Honor, it is our view that the independent, there's still an independent basis under the Lanham Act for granting an injunction. And so can you reach that on your cross appeal in the second case? Yes, Your Honor. In other words, could all the opinions be decided, all the issues be decided in the second case with the first case dismissed as moot? Yes, Your Honor, depending on how, if the order was crafted with respect to extra territory. Assuming we accepted your positions. Yes, Your Honor. Let me address some of the estoppel issues. Judge Anello did discuss estoppel, and he applied a 1965 Seventh Circuit standard for the general common law standard of estoppel and said an estoppel ends when the license terminates. And while that's the language of the agreement, the question that Judge Anello appears to be confused about is what does ends mean? And what the case law says is that ends at termination means that after termination, the former licensee is stopped from challenging the trademark license with respect to any facts that arose during the term of the license. It doesn't mean that, okay, I could just terminate, if I'm a licensee, I could just terminate the contract and then immediately challenge the mark that I've been licensing for years. That is not the rule, and that's the rule that Judge Anello assumed. So he made an error of law with respect to the estoppel issue that cut off the entire Lanham Act analysis as a potential grounds. There are other estoppel issues. We discussed the no challenge clause that we believe survives termination. We discussed judicial estoppel. We've also made an argument with respect to estoppel paese, something that hasn't been mentioned in this contract. Again, Allure has made the argument that my client, PCI, somehow waived the right to enforce this cable mark and directed Allure, don't go out there and enforce the cable mark. They're talking about an email that happened in 2002, roughly 10 plus years ago. But this agreement, which was signed in 2010 and has a merger clause, it supersedes any of the prior activity, specifically says in Article 9 that it's Allure's duty to police infringement of the trademarks. And so to the extent that any activity, if you even assume that common law and contractual estoppel didn't apply. So you're saying that after the 2010 agreement was signed, Allure didn't have to comply with the 2002 letter? I'm saying that the specificity in the 2010 agreement supersedes any prior directive. We agree with you. Blown off the 2002 letter then and enforced against some small distributor without asking Philippe Cariol for permission? Your Honor, what I'm saying is the parties contracted for it wouldn't be blowing off the prior letter. What it would be doing is saying, I now am assuming the responsibility. Allure is now assuming the responsibility. To my hypothetical, it's 2011. There's a small distributor selling cable jewelry. It looks kind of like the Philippe Cariol jewelry. So without writing to Philippe Cariol and asking for permission, Allure sues them. Case turns sour and the judge says there's no trademark in the cable design. And Philippe Cariol says, you violated our express agreement in 2002, which continues. You had no business suing, so you're responsible for all the damages flowing from our loss of our trademark in that suit. You're saying that they could do that and Philippe Cariol would lose that lawsuit? Your Honor, that's quite a remarkable hypothetical because that happened in the Tapper's lawsuit in 2012. What the jewelry agreement says is not that you have a duty to go out there and sue third-party infringers. You, being Allure, have a duty to go out and sue third-party infringers. You have a duty to police. You have to keep an eye out and inform us, PCI, if there's any third-party infringement so PCI can make the decision on who to sue and how to allocate resources to enforce the mark. And Allure didn't do that and now they're claiming, oh, it's generic, when the duty was on Allure to go out and police the mark. That's what we're saying. And in the Tapper's lawsuit, they did. The Tapper's lawsuit in 2012, which Judge Anello took notice of the pleadings in that case and actually refers to it in the decision. Allure simply just filed suit. There were copyright issues. There were trade dress issues. And they claim rights in the cable trademarks. This is the year before the suit is filed. In the very same cable trademarks, they're claiming rights in that Tapper suit and they didn't inform PCI about it. And, yes, now there is litigation involving that failure to inform it constitutes a breach of contract. So the answer would be yes to your question. How did that case come out? The Tapper's lawsuit? Taken in this record. Well, it's still ongoing and actually I believe it has come up to this tribunal. But the facts are still ongoing. The lower court notably found that the copyrights are thin at best and that the trade dress is essentially nonexistent. So, again, we get back to Allure's statements about its copyright and trade dress. It's not really been endorsed, at least by the central district of California, but those facts are ongoing. I have a very simple question. If we were to find that Allure is not estopped from challenging the trademark or that the record is insufficient to reach a decision one way or the other on the estoppel, would that defeat or that require reversal of the injunction that was issued on the contract? No, Your Honor, because the issue of trademark is completely separate from likelihood of success on the contract. There has been an effort to conflate the two, but what the judge found, he cited to a number of provisions and he found that these provisions had been breached. And not all of those provisions even refer to trademarks at all. But his order refers specifically, as counsel pointed out, that the injunction is to prohibit Allure from infringing PCI's trademarks. And in judging irreparable harm, the strength of those marks obviously is an important point. So if that's still in play, you say discovery is going on and we're only talking about a preliminary injunction. If that's still in play, wouldn't that defeat this injunction? No, Your Honor, and here's why. I want to make sure not to conflate the likelihood of success on the merits, liability for breach of contract, with the remedy for that breach. Once the elements are met for an injunction, the district court judge has broad discretion, and the standard on review is abusive discretion, in crafting the scope of the remedy for that injunction. And the fact that the scope that this judge chose references trademarks, a rather unremarkable thing given that the contract itself is a license for trademarks, is just the standard that he chose to define the scope. It doesn't mean that he was making any decision with respect to the enforceability of those marks, nor did he. It was just a natural way for him to define the behavior with respect to what is called for in the restrictions of the contract. So the contract itself is a solid, independent basis that has nothing to do with the separate issue of whether or not injunction should have been issued and should still be issued on the issue of the Lanham Act claims. And the efforts to conflate the two and bring in the issue of genericness is just a way of covering up for no response to, essentially, breaches of the contract. If you go through our brief, we go through article by article where they say, we will not mix the name Sherryall with other names. And that doesn't mean the trademark Sherryall. It says the name Sherryall. What do they do? They run a promotional giveaway for, hey, come buy my allure watch. And what do you get in the mail? You get a free Sherryall bangle that says the Sherryall name on it. That wasn't authorized under the contract. It was the sell-off provision of the contract. It was not, Your Honor. That was activity that happened before termination even occurred. And the sell-off period, just because there's a sell-off period, it's a sell-off of existing inventory. We would submit that giving away jewelry is not selling off, so it wouldn't even be pursuant to those rights. But the sell-off period doesn't give allure. What's the difference between giving away and selling off? Whenever you have a buy one, get one free sale, it just means you're selling it at half price as long as the customer buys two. There's a major difference because if you give product away for free, you're diluting the brand. I mean, we're talking about luxury jewelry here. These are pieces that sell at retail for $550, and they were giving them away for free. And so it dilutes the power of the name. And during the sell-off period, yes, there was a sell-off period. There's an argument as to whether it was triggered because we challenged whether the termination itself was valid. But allure didn't acquire greater rights during the sell-off period than it had during the main term of the contract. Just because it was in the sell-off period doesn't mean that all of a sudden it's open season, and it could go out and use the Sherry Hall name however it wanted, and it could co-mingle. I mean, we detail the broad activity, not just the promotional giveaway, but, for example, we have declarations for customers who purchased Allure brand jewelry and were shipped Sherry Hall brand jewelry. I understand now. You've used up your time. If you want to take a few seconds to wrap up, if there's something you just wanted to say at the end, go for it. Sure. The issue of breach of contract is separate from trademark as we've submitted. With respect to the contract itself, the plain language, as Judge Inella found, includes cable, and the estoppel arguments are an absolute bar to the discussion of genericness. Even if it wasn't, there was no findings below on the issue of genericness, and it's not for this court to come in and make those findings in the first instance. Thank you for your time. Thank you, Your Honors, very much. I appreciate your patience in letting us have so much time. I'm just going to make three points. I'm going to try to talk fast. The first one is this panel has a right to know that Judge Inella issued a subsequent order, which PCI was desperate to strike from this record and did so on a technicality, but this court under Ninth Circuit precedent has the right to take judicial notice. Judge Inella issued a subsequent order. It's in the docket 180. It's excerpt of record 111 in which he said, My preliminary injunction does not bar a lawyer from selling cable jewelry in general, and I can give the panel the four recent Ninth Circuit cases that say you have a right to take judicial notice of that. Shall I do so, or would that be a misuse of time? We'll ask you for it if we need it. Okay, very good. Or you can submit a 28-day letter either way. Okay. You might then ask the question, well, why are we here seeking to dissolve the second preliminary injunction, and the reason is that it's being misused in the marketplace and it's causing great damage to my client. But this panel has a right to know what Judge Inella thinks of his own preliminary injunction. Second point, Your Honor, on Estoppo, I know we've beaten it to death, but briefly, the only surviving contract clause once this jewelry agreement was terminated was 13.4. 13.1 does not generally extend everything. All it says is that the rights of either party, quote, unquote, will not be impacted by termination. That begs the question of what the rights of either party are. Well, the right of PCI not to have you challenge the mark. Well, but that's a right that's limited to the term of the agreement, and even assuming arguendo, Judge Gettleman, the proposition that it has to be facts that have arisen after the termination of the agreement, we have that here. In the over a year since, I guess it's one year since the termination of the agreement, there has been more use of cable by others in the marketplace, and that's in the record. We have PCI's own unclean hands in misusing the preliminary injunction in the marketplace, and I have to say there's a very strong public policy element here. The public has a strong interest in making sure that private parties don't monopolize what are generic marks, and that goes beyond the interest of my client. The third and the last point I'd like to make, and again, thank you for your patience, we didn't address this at all, but it is a major point, and that is that there was a clear error of law and an abuse of discretion, I believe, in Judge Anello finding irreparable harm to PCI on the second injunction. Judge Anello expressly found that PCI failed to present any evidence of any lost sale, any lost customer, any lost money, nothing. His basis for finding irreparable harm was that Allure had, quote, usurped, close quote, the distribution channels in the territory for Shariol jewelry. He missed the point that those distribution channels belonged to Allure, not to PCI. That's the whole reason they went into the agreement in the first place. And all of these elements of damages, everything PCI has complained about, disruption, lost reputation, loss of customers, lost sales, loss of distribution channels, all of that flows not from any breach of contract, not from any trademark infringement, it flows from the termination of the party's jewelry agreement. They would have had exactly the same thing had the jewelry agreement been terminated a year later in 2015 when the term was run, as opposed to 2014 when it was terminated for cause early. That's not irreparable harm. If it is, it's irreparable harm that flows from the end of the business agreement, not from any breach of contract and not from any trademark infringement. Let me make sure I understand what some words mean. Usurping the channels, I'm trying to think concretely. Since Allure was the American distributor for the Philippe Shariol, I would think that would mean that Allure has a sales force and they have Rolodex, which is basically the electronic version, where they have the number of whoever buys jewelry for Fred Myers in the Northwest and whoever buys jewelry for Zales in the Midwest and so forth, where they call those people and say, we've got some nice new designs, plus the old ones that are selling well. How many of these Philippe Shariol pieces do you want? Then after the contract, they say, we've been designing and making the Philippe Shariol pieces all along. We've got the same pieces. They're no longer Philippe Shariol. They're Allure and they're cheaper. How many do you want? Same people. Is that what it means? Is that what we're talking about? You're fundamentally correct that there's a little more major context. By the way, I still have Rolodex. Allure started business more than 30 years ago, nothing to do with Shariol. I remember that. Allure had channels. It knew some Zales purchasers before Shariol. A lot of them. The relationship between these parties began not with jewelry but with watches, which is an adjunct to jewelry. Shariol said to the principals of my client, hey, why don't you distribute my watches in the United States? My client said, okay, fine. Apparently, that was satisfactory. You're saying it's not just that they were Ariol's channels and that's why Allure was using them but also they were Ariol's channels. They were never Shariol's channels. They were never Shariol's channels. That's what channels means. It means the salesmen and the Rolodexes of who to call. Yeah. The designs, what they call in the jewelry industry doors, which are points of distribution. A door. That would mean Jane Doe at Zales, Chicago. Bingo. It's a door. Nordstrom in Seattle is a door. Allure had over 200 doors. As a result of the positive experience with the watches. I understand. A door is somebody who called to sell jewelry. That's what a channel is. Right. Then Shariol came and said, would you put my name on your jewelry also? Allure said, okay. His name. Sure. Just like when Leica asked Panasonic to make the deluxe cameras. Sure. Just a hypothetical for your honors. Let's say there's no dispute between the parties. The jewelry agreement runs its course until December 15, 2015. For whatever reason, the parties decide, you know what? We really don't like each other very much. We're going to end this business relationship. Those doors come back to Allure. Those designs come back to Allure. Those contacts come back to Allure. Every single piece of alleged damage that Shariol's claim was against. There's a provision in the contract about whether those doors come back to Allure. I don't remember one. The rights of the parties shall not be impacted by the termination of this agreement, 13.1. It didn't say one way or the other whether Shariol retains exclusive right to the distribution. Oh, no, it did not. And as a matter of competition, Shariol would have been perfectly entitled to go and try to sell its own stuff. Okay. Now I understand what the words mean. Thank you, counsel. Thank you. The time is exhausted. The case is so interesting. It would be nice to hear another hour of argument. Thank you all very much. Thank you, Judge Gould. Thanks for the fine arguments.
judges: Gettleman, Kleinfeld, Gould